Good morning. May it please the court, my name is Mary Jean Chan and I represent the United States in this appeal. I'd like to reserve two minutes for rebuttal. This court should reverse the district court's order, which was made without any analysis, suppressing the defendant's statements up to the 1 minute and 46 mark of his interview. The record shows plainly that the defendant during this brief time was not in custody. He voluntarily drove himself from work to the police to assist them in their investigation of a burglary. Could I stop you there, because I think this is a really important point of whether he voluntarily went there. Because there's case law that kind of skirts this issue. He went there voluntarily, as I understand it, in response to the police's phone call, saying please come because there's been this home burglary, which of course is not true. He didn't go there voluntarily in the sense that he thought he was going to be questioned about anything having to do with this subject matter. Could you really address, could you just focus on the voluntariness of that? What case law do I look to that really is applicable? Well, Your Honor, voluntarily is different than, for example, knowingly. And I think you can look at the Perkins case from the student court that talks about the voluntariness being separate from knowing whether what you're saying or who you're talking to is a police officer or something that's going to be incriminating. Well, everybody was in uniform, as I said, or well, maybe not everybody, but there were a lot of police cars when he got there. It was certainly, I'll just, the opposing party has certainly argued that it was a very threatening, intimidating environment because there was a lot of show of force there. So once he got there, he knew who he was talking to. But the question is, did he go there voluntarily? You know, there's other cases where we talk about voluntariness and police have called and said, would you come down to the station, we want to talk to you about, or maybe would you come down to the station and not tell the individual what's going to be discussed at all. Here, there was a ruse used by the police. Could you talk about that? Sure. I think that the ruse actually puts all the force that would be all the police presence in a different light, which was that it was all consistent with the ruse. When he arrived there, Mr. Martinez arrived at the scene and he saw the police. This was consistent with the police investigating burglary. He was asked questions within the first two minutes. Those were all consistent with the burglary investigation. How many cars did he see when he got there? He indicates in his declaration that he saw about five cars, police cars. And it's your position that would be consistent with responding to a burglary? Absolutely. I mean, when you see, for example, even somebody, a vagrant on the streets of San Francisco, oftentimes you'll see three or four officers responding to that situation. Were there how many police officers there that day? Twenty-some? Yes. But he indicates that he saw several in his declaration. And he says about six uniformed officers and two plainclothes officers. Before he went into the van to be questioned? That's what he says that he saw. That's my recollection as well. Okay. Right. So that's, I think, all consistent with the burglary investigation. It's certainly not inconsistent with that. And the standard here is what a reasonable innocent person would believe being put in that position. And so the frame of mind of a reasonable innocent person would be that there's a burglary, not knowing that it's a ruse, not knowing what the import, for example, of saying that you had used the computers might be in terms of a child pornography investigation. And I do think Perkins is really a central authority here. I mean, the Supreme Court specifically says, and I think it's well established that deceit, tricks in the use of investigating crimes is permissible as long as it doesn't trespass the line of being coercive. I think that's right. There's a lot of case law that says that. And I'm looking for case law that specifically talks about deceit in the sense of getting someone to come to answer questions voluntarily. Do you think Perkins is your strongest authority? And then I'll quit interrupting. No, I welcome your questions. I mean, I think Perkins really is the most direct one because, as Your Honor said, Red Lightning, Mathiasson, a number of these other cases, they aren't affirmative ruses in the sense... They're different. They're a little bit different because they're asking them, they're not telling them what the purpose is. But I do think that Crawford, for example, is another really strong authority. And that's where there was a pretextual parole search. The officers had no real interest in conducting the parole search, but because they believed that the defendant in that case, the suspect, was the robbery suspect at that time, was subject to paroles, they instituted a pretextual parole search for the express purpose of getting in the room with the suspect and talking with him, and then getting him then to go with them to the law enforcement offices to have a discussion about what they were really interested in. So I think those two cases are probably the most on point, Your Honor, Crawford and Perkins. Thank you. Sure. I think that under the totality of the circumstances, as I said, a reasonable, innocent person would have believed he was free to leave. And if you look at the factors that were used in Bassagnani and in other cases, the language that he was used, that was used to summon him, was all requests. He was asked. And that's consistent both in his declaration at Extrips of Record 127, where the defendant says, I believed I was there because there had been a where he says that the reason he was there was because his girlfriend had said, asked him essentially to go check out what was happening with the burglary. He was only asked to go to the van. The police report at Extrips of Record 112, once he got to the residence, indicates that Sergeant Correa approached Martinez as he exited the vehicle and asked him to walk to the forensics van. And his own declaration, the defendant's declaration, is consistent. If you look at the video, if you've had a chance to look at the actual video of the interview, you can see that the police officer in that situation is very relaxed in his demeanor. There's nothing intimidating. He's sitting. He's actually the one trapped at the back of the van with the least access to the sliding door. Mr. Martinez is placed closest to the sliding door. The police report and as well as the video indicate that it's the door was not locked. The defendant was as free as he was to come in. He should have felt as free to leave. In fact, Correa, Sergeant Correa left in the middle of this, left for quite a long time, leaving just the two Sergeant, sorry, Detective Greedy and Martinez in there and then comes back. So it's it's a free access type of situation. Plus, the van was also in a familiar surrounding in the sense that Mr. Martinez was at his girlfriend's residence. I think that it's also important to note that the degree of pressure applied to detain him was really non-existent. Again, it's all dependent upon the rules. He came voluntarily to assist the officers. And the duration of the detention, I think, also is a very compelling factor to show that it was not in custody. We're talking about one minute and 46 seconds of an interview of a total interview that was about 25 minutes. This court has repeatedly found that much longer interviews are not custodial, not by the duration of time. I'd like if there are no other questions. Well, I guess I guess my biggest point that I have to suggest is what deference do I need to give to the fact finding by the magistrate? Sorry for the for the warrant, Your Honor. Yeah, I think that it would be the same standard, the clear error, but I apologize, but I'm not sure why that would be relevant here. All right, then what deference should I give to the fact finding by the district court? It would be a clearly erroneous standard, but Your Honor, the district court in this case didn't make any fact finding. There was no evidentiary hearing. There was no fact finding. If you look at the record, which is at excerpts of record six, the district court simply said, out, out, all this evidence is out. These statements are out. Counsel, we've all seen that, but under in this context, I think what Judge Smith is getting at it, there isn't any question there was an interrogation going on. So wasn't isn't there an implied fact finding by the district court that this was custodial? That's the issue, isn't it? Yes. For the 1 minute and 46 seconds we're talking about, that is the fact. So that so that, Your Honor, is de novo. I mean, that is all reviewed under a de novo standard. That's not a fact finding. The determination that the facts amounted to custodial is subject to a de novo review. Well, I just wanted you to focus really on the fact finding and and go where you did, which is what is fact finding and what isn't in that particular situation? Because I read through what the district court did. I also read through what the district court said about the magistrate court. And so I wanted you to comment about that. Thank you, Your Honor. Good morning, Your Honors. May it please the court. My name is Jeff Hanson. I represent the appellee for the first time in my professional career. I don't have to ask for rebuttal time, an unusual posture to be in. I will certainly say at the beginning, Your Honor, to Judge Smith, there was no fact finding. I agree, and it's subject to de novo review. The issue that you've raised, Judge Christian, it seems to me is the core of this appeal, and it's a fascinating academic issue, which is when a lie to an individual becomes something which essentially overpowers their will or at least suggests that what they did was involuntary. I don't think there's any dispute that if my client was threatened, either you come and see us at this address or we'll harm your family, everybody will say that was a threat and that would render his going to the house involuntary. Similarly, if you were sitting here on the bench today and the clerk, it seems to me, were to come up and say, here's a note, a ruse note that says the family who brought with you to San Francisco has been in an accident and you should come down to the circuit executive's office immediately. There's some police officers that want to talk to you. And you were suspected of having been in a hit and run last night. I suspect that you might immediately leave the bench, however interesting it might be to listen to people argue, and you might leave the bench and go down to find out what had happened. And if you were to get down there and they were to say, Your Honor, do you have a car? And you say, yes. And were you driving it last night? And you might have a question. You say, I was. And they say, well, now we have a confession from you that essentially says that you have a car. But, counsel, they didn't do anything like that here. They asked him to come to his girlfriend's house, not his own house. And they didn't suggest that she was harmed or in danger. What they said is there's been, you know, some property missing, something. They told her something I think was found in the driveway, a laptop or something. No. It was found in the driveway. And so he was coming down to help them identify some property. It wasn't a question of her having been harmed or in danger. It was that there was a burglary at the house. And it seems to me, Your Honor, in light of all of the opinions that have come about the sanctity of the home, it's pretty darn close to be able to say your house has been burglarized, your house has been violated, please, in the language that was used by the officer, which is why I believe Judge Pryor never made any factual findings. I directed him or asked him to come down there because there had been a burglary and to help secure the residence and identify missing property. Right. So that's really qualitatively different than your hypothetical, which is my only point, because there wasn't any suggestion that a family member or that his girlfriend was in danger or harmed. But could I ask you, because I think this is important to my thinking, at the time they interviewed him at the outset, did they know he had been staying there, residing there? I think I don't believe they did. I don't believe they had any idea at that point who was operating any of the computers in the house. Did the girlfriend say her live-in boyfriend had been there? Did she call him a live-in boyfriend? I don't believe she called him a live-in boyfriend from the record that you have in front of you. OK. The record at 112 and 113 indicates all that we have in terms of factual background of that. And they called her, and then I believe she said my boyfriend they said my boyfriend was there last night. They said call him ASAP and direct him to come call us. They asked her. They didn't direct her, right? Well, I again, that's not clear in the record, Your Honor. OK. Well, you just represented that they told her. And I don't know that, do I? I we can look at the record itself. But the language that was used, as I said, is in 113 of the record, in terms of what she was told from I'm familiar with 113. So when he came into the van, he had a prior conviction for a similar crime. Did they know that? Or did they just learn that? I mean, I've seen the video. So I recognize that there's a time where they've checked his record and hand that back into the van. But at the outset, since we're just talking about the first 1 minute, 46 or 7 seconds. Correct. Did they know that about him? They did not. They did not know his background at all at that point. But again, to get back, Your Honor, it may be a matter of degree. But the concept is that when you take an individual and you play on their emotions to say, we want you to come see us, the voluntary issue becomes very clouded. Kim is the case from the Ninth Circuit, I think, most on point. And I think that controls this. Kim is the case, as we all know, is where somebody voluntarily went down to see if her child was OK when there had been a burglary, not dissimilar to this or she thought there was. Well, that child was an adult son, right? A young adult son. I mean, it wasn't like a little child, minor, was it? But no. He'd been down at the store. Well, I think it does go. I mean, I don't mean to be, you know, splitting hairs, but I think it goes does go to this voluntariness question and the degree of coercion that's used at the time. In the Kim case, I think she was going to her store to check on her adult son because there had been some. Correct. OK. Correct. But the point was not really the degree of voluntariness. The point was that she went down there with no expectation of having been interviewed about, you know, selling or possessing drugs. And this Court emphasized clearly that in that kind of situation, you can't say that she went voluntarily to be interviewed. And isn't that, after all, Your Honors, the nature of the inquiry that we're trying to discover here? But in somebody in Kim, did they coax her down there? No, she went. She went down because she feared for her family, not dissimilar to somebody, I think, fearing for the sanctity of their house that they've been told has been violated by a burglary. So you go. Go ahead. I don't want you to go, Your Honor. You go there. And then it seems to me that what we look at is, did you go with the idea that you may have been questioned about something you did wrong? And Kim says, unless that's clear, you can't call it voluntary in a situation even if physically she walked there without somebody carrying her or having a gun pointed to her head. She went there voluntarily. So it seems to me that what we then do is look into the analytical framework created by Kim and essentially set forth in Miranda about the police-dominated atmosphere. And that's what you alluded to, Judge Christian, earlier in your questions, that when you have the number of cars that were here, police officers, and when my client said he when he got out of the car, he was escorted to the van. The police officer said, I asked him, would you please come with me to the van? I'm not so sure the differentiation between that being a question and a directive is it's lost on me as whether that's really a difference. But he was taken into the van. And then you have the van in front of you, which is, again, I think why Judge Breyer never made the factual findings. I don't think there can be any clearer example of a coercive or police-dominated atmosphere than a tiny little van in which somebody is told to step into the van. And by the way, Mr. Correa in his declaration at 113 said, I asked him to step into the van. But you have the transcript in which he just said, step up into the van. My client stepped in. The door was closed behind him. It's a tiny van. And then they immediately hit him with the questions, which, of course, are most inculpatory. Government counsel alluded to the idea of the duration of the interrogation. And certainly that's a factor that the Ninth Circuit used in Kim to analyze whether or not something was coercive. But again, it's something that's a little bit lost on me. If you take somebody in for the traditional out of the old movies, the third degree, you put them down and you put the klieg lights on them and you have four officers around you, all are armed. Maybe somebody puts a gun on the desk and then you say, did you do it, Joey? And Joey says, I did it. That's a short interrogation. Would anybody in their right mind say that wasn't a coercive situation? No. So it's the factors that go into it. In this case, my client happened to very quickly, in response to what he thought was help from the police officers. After all, subtly, when you say, please come, we need your assistance because your house has been burglarized to identify stuff, you are offering that individual help. And thus, it seems to me, a person in my client's situation is beholden to them and they begin to ask questions of them of a highly incriminating nature. Of course, he's going to answer them. I'm sorry, but I'm going to interrupt you. Yes, sir. It doesn't seem to me you're now answering Judge Grissom's questions anymore. I want to go back to the second factor, confronting with the evidence of guilt. And I'm talking about the second factor under Kim. Tell me why this situation is different than the situation in the United States versus Curtis. Well, Your Honor, the difference in this, there is no, he was not confronted with adverse. I concede that he was not confronted with adverse evidence. Well, in the United States versus Curtis, they held the defendant was not in custody. Yes, sir. And it seems to me that then as to the second factor of Kim, I would say then it would lead to voluntariness, would it not, rather than custody? Well, voluntariness is an inherent part of the custody test, at least under the Kim five factors that we've all referred to. What I do is in trying to make these determinations and without any help from the district court, I guess, then I use the five factors of Kim. So I look at the first factor, the language used to summon. Frankly, I think that goes both ways. One time I might think this really is custody. Another time I might not. If I go to the second factor, confronting with the evidence of guilt, it seems to me the United States versus Curtis would suggest no custody here. Your Honor, I don't disagree with the fact he wasn't confronted per se with evidence of guilt. He was asked highly incriminating questions. But then the third factor of Kim, that's I'm sure you're about ready to get to. Well, that's where I was going next, because you're already at fourth. You already anticipated where I was going on fourth. Sure. And I heard your argument. Third factor, physical surroundings. And I think that's, I hate to say it, a no-brainer. If you look at, you have the proof in front of you with that videotape, which is clear as a bell. I really don't see how you can get a more coercive answer. But what about the duration of the detention? That certainly cuts against you, because we're only talking about a minute and 45 seconds. As I just said, Your Honor. And then the degree of pressure applied to detain the individual versus the degree of pressure to get him there. That gets a little muddy in the briefing. It does. But I think then what you look at is the number of police officers, the manner in which they were armed, the manner in which he was taken directly into that. All of those are matters in which I think you find that he was, his freedom was constrained. I don't think any reasonable human being in my client's situation would have ever suspected he was free to go. And, Your Honor, to finish up then, if you take the Kim factors, the five view, Kim factors went on, though, and said, here are really, in some situations, what we look at. Then they talk about the number of police officers, whether the client was isolated from others, whether he was informed of his right to leave, which my client was never informed of. My time is up. But as a consequence, I think Judge Breyer had it right. This was a custodial interrogation. I ask that you affirm the district court. Thank you, Your Honor. Thank you, counsel. Your Honors, I just want to clarify very quickly that an excerpt of Record 112, Vitello said that her boyfriend lives with her at the residence, is what is reflected in the police report. That said, Martinez, once he got there, specifically said in his declaration that I was here last night. I was just keeping an eye on the place for her. During the interview, when asked where he lives, he said 2640 Center Road, repeatedly where he lives now is there. In his declaration, an excerpt of Record 126, he says, I have stayed overnight at 820 Penny Royal Lane. So he has at every turn denied that he lived there, despite the characterization of his girlfriend. His girlfriend, who actually did live there, did feel free to say no, that she would not assist in the investigation of the burglary of the house. I think that goes to showing that a reasonable, innocent person faced with these circumstances that the defendant did would have felt free to leave. Thank you. Thank you, Your Honor. Appreciate your argument. Both arguments were very good. Case 13-10390, USA versus Martinez is submitted.
judges: Piersol, SMITH, CHRISTEN